Frank Liu

304 S. Jones Blvd #3416

Las Vegas, NV 89107

818-835-0498

frank.liu.96@gmail.com

Pro Se Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Frank Liu<br><br>    Plaintiff,<br><br><br>    vs.<br><br><br>The Nielsen Company (US) LLC<br>    and<br>TNC US HOLDINGS<br>    Defendants. | **Case #1:22-cv-09084-JHR-OTW**<br><br>**EXHIBITS in Support of Plaintiff's Response in Opposition to Defendants' Motion Letter to Stay Discovery (ECF 55)** |

# Exhibit A (Defendant Nielsen's Position Statement sent to the EEOC)

# Buchanan Ingersoll &amp; Rooney PC

401 East Jackson Street, Suite 2400
Tampa, Florida 33602

**Cathy J. Beveridge**
REDACTED

T 813 222 8180
REDACTED

January 27, 2020

<u>Via EEOC Portal</u>

Nelson Borges, Investigator
U.S. EEOC Tampa Office
501 E. Polk Street, Suite 1000
Tampa, FL 33602

   Re:  Charging Party: Frank Liu
      Respondent: The Nielsen Company
      EEOC Charge. No.: 511-2019-03064

Dear Mr. Borges:

  This letter is the Position Statement of The Nielsen Company (US), LLC ("Nielsen") in the above referenced matter. Nielsen denies the alleged charges of race and disability discrimination and retaliation and in response submits the following information. [1]

---

[1] Nielsen considers this response and any attached materials to be confidential commercial information pursuant to the nondisclosure rules under Section 706(b), Title VII of the Civil Rights Act of 1964 and 5 U.S.C. Section 552(b) (as implemented by 29 C.F.R. Section 1601.17). See 42 U.S.C. Section 2000e-8(e). Consequently it requests that, in the event of a request for disclosure of any part of this response, proper identification of the request be given to and written approval be obtained from Nielsen pursuant to applicable regulations. Such notice will permit Nielsen to seek appropriate administrative or judicial review of a determination to release any data contained in this Statement of Position. Upon being notified of such a request, Nielsen will state whether it has any objections to the release of the information. Nielsen further considers any oral statements made to the Commission by Nielsen to be confidential and states that any such statements will only be made under that express understanding. This letter and the attachments are being submitted to the EEOC in confidence with the understanding that they will remain confidential and will not be released outside the EEOC except as expressly provided by law. This Position Statement is not to be construed by the EEOC as a waiver of any objections Respondent may have to the sufficiency or the timeliness of the Charge or to the EEOC's jurisdiction. Respondent provides this Response in order that these matters may be resolved expeditiously, subject to any and all objections which Respondent may have. By submitting this Position Statement, Respondent in no way waives its right to present new or additional facts or legal arguments based upon other information or evidence. Further, this Position Statement, although believed to be true

January 27, 2020
Page 2

Nielsen is the leading provider of television audience measurement and related services in the United States and Canada. Its services provide audience estimates for all national program sources including broadcast networks, cable networks, Spanish language television, and national syndicators. Local rating services estimate audiences for each of approximately 210 television markets in the U.S., including electronic metered service in approximately 52 markets. Nielsen also provides competitive advertising intelligence and Internet usage information to major advertising clients throughout the U.S.

Nielsen is an Equal Opportunity employer and maintains an Equal Employment Opportunity Policy that states:

Nielsen is committed to complying with all applicable federal, state and local fair employment practices laws. It is a fundamental policy of Nielsen to provide equal employment opportunity for all employees, applicants, or other covered individuals regardless of race, color, religion, national origin or ancestry, gender (including pregnancy), sexual orientation, gender identity or expression, age, marital status, veteran status, disability status, genetic information or any other characteristic protected by applicable federal, state or local law. This policy applies to all terms and conditions of employment as well as all employment policies and practices, including, but not limited to, those affecting recruitment, employment, promotion, transfer, layoff, termination, compensation, benefits, company-sponsored training, tuition assistance, and social as well as recreational programs.

Nielsen is committed to complying with the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act, and all applicable state or local laws. Consistent with those requirements, it is company policy not to discriminate against qualified individuals with disabilities in regard to application procedures, hiring, advancement, discharge, compensation, training, or other terms, conditions, and privileges of employment. Nielsen will reasonably accommodate qualified individuals with a disability if such accommodation would allow the individual to perform the essential functions of the job, unless doing so would create an undue hardship. An individual who can be reasonably accommodated for a job, without undue hardship, will be given the same consideration for that position as any other applicant.

Nielsen is committed to maintaining a work environment that is free of discrimination and harassment. In keeping with this commitment, the company prohibits conduct having the purpose or effect of interfering with an employee's work performance or creating an intimidating, hostile, or offensive work environment on the basis of an employee's race, color, religion, national origin or

---

and correct in all respects, has been prepared based upon interviews of those who appear to have the most knowledge, prior to full and comprehensive interviews of all persons with information. This Position Statement does not constitute an Affidavit and is not intended to be used as evidence in any EEOC or court proceeding in connection with the above-referenced Charge.

January 27, 2020
Page 3

ancestry, gender (including pregnancy), sexual orientation, gender identity or expression, age, marital status, veteran status, disability status, genetic information or any other characteristic protected by applicable federal, state or local law.

Accordingly, Nielsen strictly prohibits and does not tolerate discrimination or unfair treatment of any employee, applicant, or other covered individual nor does it tolerate any form of unlawful harassment. Violations of this policy are grounds for disciplinary action, including termination of employment. Employees who believe that certain actions or behavior do not conform to our policies, or who feel that they have been subjected to some form of discrimination or harassment, should discuss the issue with their manager or with a Human Resources Business Partner. It is the responsibility of everyone at Nielsen to give their full support to our policy of Equal Employment Opportunity. It is also our responsibility to ensure that we maintain a working environment free from discrimination and harassment.

If you are aware of any violation of this policy, please talk to any of the following:

- your manager

- another manager

- your local Human Resources representative

- your local Legal Department representative

You can also contact the North America Ombudsman: by email at North**REDACTED**.com, or by calling 855-**REDACTED**, or by completing an online form at https://**REDACTED**.com/Nielsen, and providing as many details as possible, such as names, dates, times and places to facilitate the investigation.

Your continued support and cooperation will help ensure a harassment-free workplace.

(See Exhibit A: Nielsen's Equal Employment Opportunity Policy.) Nielsen encourages each employee to report any conduct which he or she believes to be discrimination or harassment, and it maintains a specific policy for reporting concerns about any type of misconduct. (See Procedures For Reporting Concerns About Misconduct attached at Exhibit B.)

As a stated above, Nielsen will provide reasonable accommodations to qualified individuals with a disability and will not discriminate against any qualified employee because of that individual's disability or perceived disability. Nielsen also prohibits any retaliation against an individual for requesting an accommodation or for a good faith complaint about discrimination. (See Exhibits A and B.)

January 27, 2020
Page 4

## I. Background

Frank Liu ("Liu") began work with Nielsen on or around January 11, 2016 as a Panel Membership Recruiter ("MR") in the Las Vegas, Nevada area. Since Liu is bilingual, which was an asset to Nielsen, he received extra pay each year to use this ability. (See Exhibit C, offer letter dated December 21, 2015) As a MR, Liu's duties included walking or driving to statistically selected homes and recruiting those households without an appointment; conducting in-person interviews with household members and determining eligibility to participate as a Nielsen family; persuading and educating the households while overcoming objections to participation, maximizing panel participation, and building rapport with the family; adhering to Nielsen methodology and following Company policy and procedures; and collaborating with Nielsen Field Representatives and other personnel to ensure a quality sample and compliance with methodology. Liu, like other bilingual Nielsen employees, used his language ability to translate during his interactions with prospective households and, at times, for other team members.

On or around October 25, 2016, Liu transferred from Nevada to work in the Everett, Washington area. Liu worked in Washington as a MR, with the same job duties as his original Las Vegas area job with Nielsen. While he was an employee in Washington, a dog bit Liu, so he received treatment covered by the worker's compensation system.

In or around July of 2017, Liu transferred as a MR to the SWAT team. Typically, there are about a dozen MR SWAT team members. MRs on the SWAT team have no assigned geographic market. They are dispatched to different markets to help out with the signing of households based on business needs. Because of the transitory nature of the SWAT teams' assignment to any one market, Nielsen pays for expenses, like lodging, a car, and food allowance, for the team members.

When Liu originally joined the SWAT team, his manager was Luke Berglin. In or around September of 2018, Tanner Tate took over as the SWAT team manager.

### A. Nielsen Did Not Condone Any Racist or Discriminatory Statements

Liu makes a number of claims that Nielsen condoned racist and discriminatory statements in the workplace. These allegations are patently untrue.

First, Liu claims that during a phone call, Tate said to him, "Don't be a chink." Liu never raised this to anyone in management or Human Resources at Nielsen during his employment at Nielsen. Liu brought this up to Nielsen's Human Resources, for the first time, many weeks *after* his employment had been terminated.

Nielsen conducted a thorough investigation immediately upon learning of Liu's allegation. During the investigation, Tate denied making any such statement. All SWAT associates working with Tate were interviewed, and they all confirmed that they had never witnessed or heard Tate make any discriminatory or harassing statements. Notably, one other associate on Tate's team is also Asian-American, and confirmed that Tate had never

CONFIDENTIAL

January 27, 2020
Page 5

discriminated against Nielsen associates.

Liu also makes cursory allegations that colleagues on his team sent text messages of a racist nature and that Tate defended these colleagues. Nielsen wholly denies that any managers condoned racist or discriminatory messages.

### B. Liu's 2018 Annual Review Reflected His Interpersonal Issues

Liu signed a large number of households to participate in Nielsen's panels. Nielsen monitors the number of households enrolled as panelists and certain other metrics (the "What") of its SWAT MRs. Nielsen also monitors the "How" of each member's contribution to the SWAT team. On the annual evaluation are several categories that relate to how each MR interacts with his peers and his managers. On his evaluation for 2018, Liu received the following constructive criticism: "I think you have a strong sense of accountability in regards to the "What", but there does appear to be some resistance to authority, or direction from management, as well as a negative behavior issue. This is evident in the way you respond to email and interact with management and your peers. As I have mentioned, I have had several managers request you do not return to their market because of their interactions with you. This is combined with several of your peers. Your behavior impacts others and when it is in a negative way it can affect your role as a SWAT MR and our team. There has been some improvement this year in regards to your emails such as saying thank you, please and you're welcome. These little niceties can go a long way. You can improve in these areas a lot in this year." (See Exhibit D: 2018 Annual Summary for Frank Liu)

Tate emailed Liu to set up a meeting to discuss his 2018 evaluation and to schedule an opportunity to ride along with Liu and observe his work. Managers who have employees working in the field schedule observation opportunities with each of their team members, in order to offer valuable feedback. Liu pushed back against Tate's request to observe his work. In an email, Liu stated "I prefer to work alone, especially while driving as this way I can concentrate more on the road as it is more critical here than anywhere else in the country." Tate had not observed Liu before, so Tate insisted that he accompany Liu as his manager. (See Composite Exhibit E, Liu and Tate emails dated March 18, 2019.)

### C. Liu Failed to Cooperate With Respect To An Alleged Injury

As part of Liu's and Tate's email exchange to set the timing of the ride along, Liu informed Tate that he was having an issue with his right ankle or foot. Liu's email stated "I also recently think [I] sprained my ankle or foot last week as the streets are very uneven for walking, and was walking down steps etc., so not fully recovered yet. It is sort of bruised but imagine is healing." (See Composite Exhibit E, Liu and Tate emails dated March 18, 2019.)

Liu was still actively working when he emailed Tate about this issue. The next morning, Tate responded to ask Liu if he was working when he injured his ankle. Liu explained that he first injured himself when he stumbled while walking to a grocery store. The second time he injured his ankle was while he was walking down steps while working. Tate explained how to

CONFIDENTIAL

CONFIDENTIAL

January 27, 2020
Page 6

report the injury for treatment in the worker's compensation system.   Liu expressed unhappiness with how the worker's compensation treatment process worked for his earlier dog bite, and he declined to report the injury.  Liu scheduled the ride along with Tate.

Tate discussed Liu's evaluation during their time together.  As quoted above, Liu received constructive criticism for his interactions with co-workers and managers.  Liu did not agree with this criticism.

On March 27, Liu followed up to report his injury.  Liu emailed Tate that he believed his ankle might be broken, and he wanted to obtain an x-ray.  In response, Tate emailed Liu to let him know if Liu needed any time off from work.  Liu reported the injury and obtained treatment. The initial medical paperwork provided by Liu to Nielsen contained very few specifics about Liu's injury (See Composite Exhibit E, Liu and Tate emails dated March 27, 2019).  Nielsen, like many employers, requires employees with worker's compensation injuries to provide medical information that details any necessary restrictions on their ability to perform their job duties and what reasonable accommodations they need.  Liu's initial paperwork dated April 1st stated "Please use crutches all the time as advised, keep splint until follow up with podiatry in 2 days.  Please follow up with Dr. R. Patel in 2 days.".  (See Exhibit F: Liu ER report dated April 1, 2019,)

Liu later provided additional paperwork that read:  "Frank Liu is being treated at our offices under Dr. Patel.  Please allow him to wear his brace while working.  If possible, accommodate the patient with jobs/locations that require less walking and travel.  He will have to wear the brace for two weeks starting Monday April 1st."  (See Exhibit G: Ridge Foot and Ankle Associates medical note concerning Frank Liu's treatment.)

To assess whether it would be possible to accommodate the doctor's request, Nielsen personnel asked Liu for more information.  Of particular interest was what the doctor meant by "If possible, accommodate the patient with jobs/locations that require less walking and travel". Liu told Nielsen personnel that he could return to work and manage his injury without the need to produce any additional paperwork to clarify what the doctor meant.  Liu treated the wording "if possible" to be a request, but not a requirement or limitation on his ability to perform his job duties.  Also, Liu told Nielsen personnel that his ankle still hurt when he walked.  Liu acknowledged that he typically walked a lot on any given workday and that he sometimes had to climb up and down steps.  This description was consistent with the typical MR's workday.

At the time of Liu's injury, he was working in New York City and the surrounding metropolitan area.  Walking was a necessary part of Liu's daily essential job duties.  MRs do not know whether there will even be an elevator when they have to visit a household on the upper floors of a multi-story building.  Nielsen was interested in how much time that Liu could spend walking and climbing steps each day.  Also, Liu drove a rental car as part of his job.  His right ankle was injured.  It is unclear from the note whether "travel" might be a restriction on driving or whether the term was a reference to some other potential restriction.

Liu was emphatic in his insistence that he could manage his injury and any limitations,

January 27, 2020
Page 7

contrary to what his doctor's note stated. He wanted to immediately return to work. Because he asked to return to work, Nielsen's Human Resources asked Liu to provide updated information from his doctor to explain what limitations needed to be placed on his walking and travel. Alternatively, if he no longer had travel or walking restrictions, Liu was asked to provide a doctor's note that clarified that he had no medical limitations or restrictions. Liu was receiving pay from Nielsen during the time that Human Resources was requesting this medical information.

Strangely, Liu refused to provide another doctor's note to either his manager, Human Resources or to Nielsen's worker's compensation coordinator, who was attempting to help with Liu's injury and return Liu to active duty. Liu was also rude and disrespectful to Nielsen's worker's compensation coordinator while interacting with her. When she tried to explain that he needed to provide updated medical documentation to return to work, he yelled and used abusive language with her.

### D. Nielsen Terminated Liu's Employment

Over an approximately six week period of time, Nielsen's Human Resources, Nielsen's worker's compensation coordinator, and Sedgwick (Nielsen's third-party benefits provider) repeatedly asked Liu to provide updated medical documentation, so that he could return to work as he requested to do so. Liu refused to return to a medical provider to get updated documentation. Sedgwick made medical appointments on his behalf and Nielsen provided him with specific directions. Liu was uncooperative. Throughout this time, Liu refused to provide the necessary paperwork for a worker's compensation leave and was fully paid by Nielsen.

During Liu's fully paid medical leave, he continued to perform work-related tasks on his computer. Nielsen personnel directed Liu to stop work and to obtain the needed medical paperwork. In response, Liu was rude, abusive, and raised his voice.

Liu refused to provide updated medical information or documentation to return to work, although he continued to request to do so. Ultimately, Liu was terminated for his repeated refusal to cooperate in a professional manner with routine requests for additional medical information.

Liu was terminated by Nielsen during a call with Tracy Staines and Shannon Buggy on April 23, 2019. He was paid until Friday, April 26, 2019, so that he could return company property and his rental car. Liu's manager, Tanner Tate, did not participate in the decision to terminate Liu.

January 27, 2020
Page 8

## II.    Argument

### A.  Liu's Allegations Do Not Support the Claims of Race and Disability Discrimination

Liu claims that his termination was motivated by both race and disability discrimination. Nielsen denies that it discriminated against Liu in any way.  Liu was terminated because he failed to cooperate in a professional manner with Nielsen's legitimate efforts to work with him after he injured his ankle.

Liu cannot establish a prima facie case of disability discrimination.  First, Liu does not identify his claimed "disability" in his Charge.  Assuming that Liu is referring to his injured ankle, Liu cannot show that this temporary injury would rise to the level of a protected disability under the Americans with Disabilities Act ("ADA").  Also, Liu cannot be regarded as disabled for the same reason that a temporary condition will not be a covered disability under the ADA. Nielsen is not aware of any other potentially disabling condition Liu experienced other than the ankle injury.  Further, Liu has not brought forth even a shred of evidence supporting an inference of discrimination.  Liu has not pointed to any similarly situated Nielsen associates who behaved as he did, but were not terminated.

Liu also cannot establish a prima facie case of race discrimination.  As described above, Liu's race and second language ability were looked upon as a positive by Nielsen.  Liu received extra pay because he could serve as a translator.  Liu does not convincingly explain why his race suddenly became a problem to Nielsen.  Liu's allegation that he was discriminated against on the basis of his race is purely speculative at best.  Liu cannot establish an inference of discrimination and cannot point to any similarly situated individuals who acted as he did, but were treated differently.

Liu was terminated for a legitimate, non-discriminatory reason: he demanded to return to work after an injury, but wholly refused to cooperate with Nielsen's and Sedgwick's standard processes and reasonable requests for medical documentation.  He was also rude, abrasive and used profanity when speaking with Nielsen associates.  Liu cannot show that this reason for his termination is a pretext for discrimination.

### B.  Liu's Allegations Do Not Support a Claim of Retaliation

Liu also claims that he was terminated in retaliation for complaining of racism.  It is unclear what protected activity Liu is referring to in his charge.  As noted above, Liu complained to Nielsen that Tate had said to him, "Don't be a chink."  However, Liu only brought forth this complaint *weeks after* he was terminated.  Accordingly, this complaint cannot be the protected activity that forms the basis of Liu's retaliation claim.

Moreover, Liu cannot show a causal connection between any protected activity and his termination.  Quite simply, he was terminated for being insubordinate and refusing to cooperate with Nielsen in providing medical documentation. Accordingly, Liu's retaliation claim fails as a

January 27, 2020
Page 9

<span style="color:red">CONFIDENTIAL</span>

matter of law.

**III.    <u>Conclusion</u>**

     Based upon the above information, Nielsen respectfully requests that a finding of no probable cause be made and this Charge dismissed.  If you have any questions or require any additional information, please do not hesitate to contact me.

     Best regards,

     BUCHANAN INGERSOLL & ROONEY PC



     Cathy J. Beveridge

CJB/fl
Attachments

4843-0119-9794, v. 1

<span style="color:red">CONFIDENTIAL</span>

# Exhibit B (Spangler refusing to provide Sedgwick NJ Case Files and refusing to confer)

 Gmail

**F L <frank.liu.96@gmail.com>**

---

## Request to confer for Motion to Compel

**Spangler, Cardelle** <CSpangler@winston.com>                    Mon, Oct 16, 2023 at 4:45 PM
To: F L <frank.liu.96@gmail.com>
Cc: "Smith, Aubrey" <BASmith@winston.com>, "Tran, Caitlin" <CWTran@winston.com>

Your request is premature.  In addition, a request by email is not appropriate.  Accordingly, there is no need for a meet and confer.

Thank you,

Cardelle

**Cardelle Spangler**

Winston & Strawn LLP

D: +1 312-558-7541

winston.com

*Pronouns: She, Her, Hers*



---

**From:** F L <frank.liu.96@gmail.com>
**Sent:** Monday, October 16, 2023 6:43 PM
**To:** Spangler, Cardelle <CSpangler@winston.com>
**Cc:** Smith, Aubrey <BASmith@winston.com>; Tran, Caitlin <CWTran@winston.com>
**Subject:** Re: Request to confer for Motion to Compel

Ms. Spangler,

Laura was added to the email by mistake.  I have removed her and added Caitlin Tran who was supposed to be on the original email instead.

We had our Rule 26 meet and confer several months ago.  Defendants have not filed a motion to stay discovery.  Therefore, please let me know when we can confer, or if you are refusing to confer.


Thank you.


On Mon, Oct 16, 2023, 4:34 PM Spangler, Cardelle <CSpangler@winston.com> wrote:

Mr. Liu,


The Court has not yet set approved your filing of your amended complaint or set a date for Defendants' renewed motion to dismiss.  Your request is, among other things, premature.  Thank you.


Sincerely,


Cardelle


**Cardelle Spangler**

Winston & Strawn LLP

D: +1 312-558-7541

winston.com


*Pronouns: She, Her, Hers*

---

**From:** F L <frank.liu.96@gmail.com>
**Sent:** Monday, October 16, 2023 6:13 PM
**To:** Spangler, Cardelle <CSpangler@winston.com>; Laura S. Bautista <lsb@thorndal.com>; Smith, Aubrey <BASmith@winston.com>
**Subject:** Request to confer for Motion to Compel


Ms. Spangler,


I previously sent you an email titled "Requesting my New Jersey Sedgwick Case Files (case 1:22-cv-09084)" in which I have received no response.


I believe before a party files a motion to compel a response to discovery, the party must make a good faith effort to confer with the other party.

Please let me know when we can confer as I plan to file a motion to compel discovery.

Thank you.
[Quoted text hidden]

---

**~WRD2095.jpg**
1K

# Exhibit C (Emails to Nielsen Human Resources before I was Terminated)



**F L <frank.liu.96@gmail.com>**

## Fwd: Connecting

**Frank Liu** <frank.liu@nielsen.com>                                  Wed, Apr 17, 2019 at 5:55 PM
To: Frank Liu <frank.liu.96@gmail.com>

---------- Forwarded message ---------
From: **Frank Liu** <frank.liu@nielsen.com>
Date: Wed, Apr 17, 2019 at 8:55 PM
Subject: Re: Connecting
To: David Kenny <david.kenny@nielsen.com>, Nancy Phillips <nancy.phillips@nielsen.com>, Shannon Buggy <shannon.buggy@nielsen.com>

Hello will the John Payton issue be relooked at?  Or will Nielsen allow it to slide?  I am uncomfortable providing more illegal acts if there is no confidence Nielsen is not handling existing reports.  + David Kenney.  Thank you.

On Tue, Apr 16, 2019 at 12:40 PM Frank Liu <frank.liu@nielsen.com> wrote:
> Hi Shannon,
>
> Furthermore, Please explain this "My understanding is that there have been numerous attempts by Nielsen's HR, management and workers' comp teams to have an interactive dialogue with you on your request to be reassigned to a driving role."
>
> Also wanted to know if you have been talking to Tanner about this?  I thought we agreed we were going to keep Tanner out of the loop on my complaints about him on for now.  So everything does go back to Tanner, correct?  Thank you.
>
> On Tue, Apr 16, 2019 at 12:35 PM Frank Liu <frank.liu@nielsen.com> wrote:
>> Hello,
>>
>> In addition I am reluctant to share more information as it is my understanding that Nielsen management likes to cover up things if reported.  Eg.  John who was never on my original call with Hang telling me that I misheard Hang which I did not.  Also the double standard of using that against Hang when I was coerced to drop it, and then not having HR rectify it until I brought it up to HR about the time I rolled back.
>>
>> In addition, in my opinion it was worse to have a manager John Payton threaten me with a HR call for texting Gabe about the time card issue than what Hang did.  One is a coverup, and coersion (John Payton).  The other is just a labor violation (Hang).  However it was just Hang who was fired despite I agreed to drop it upon being coerced, so if I dropped it by John wanting it to stay between us 3, why was it used against Hang?  How did HR know as Hang said he was asked about it.
>>
>> I might be willing to share examples of Tanner coercion/retiallation/harassment etc. but I suspect HR may just cover it up somehow.  Maybe share some, and if no action is taken by HR, then stop sharing?  Just a thought.  Thank you for reading.
>>
>>
>> On Mon, Apr 15, 2019 at 2:52 PM Frank Liu <frank.liu@nielsen.com> wrote:
>>> Hi Shannon,
>>>
>>> If you are referring to my "desire" to be a regional trainer as a "driving role", then the hidden idea behind that has more to do with NOT wanting Tanner as my manager then it was to be a trainer.  I thought if I was on a different team and Tanner was no longer my manager and by going regional trainer, I could still travel, then I would escape Tanner and the retiallation, harassment etc. from him.  Regional trainers get like $62500 salary no OT/no bonus.  I made more than that last year around 89000.  So it has more to do with leaving an abusive manager than anything but of course I can't say that as my reason to his face.

Again, my experience with Nielsen is there has retiallation, coercion, discrimination.

Thank you for reading.

On Mon, Apr 15, 2019 at 1:46 PM Frank Liu <frank.liu@nielsen.com> wrote:

Hi Shannon,

Thanks for the email, but I am not understanding the context. What do you mean by driving role?  I have been prevented to go back to work by management.  In addition, before then there has been discrimination, retaliation, coercion.  Part of the problem in me being reluctant in sharing info is for example management using things I say or don't say to retaliate against me.

Or management acting clueless or pretending to be clueless about things.  And there are 2 examples I can show.  One recent example is even though I was told Friday that Sandee was part of the decision making process, she emailed me asking why I am CCing her, and despite I never started that CC chain. The emails were just to Chris, and it did not appear she was in the loop until I had to ask Tanner name the people who were apart of this.

The other example is John Payton and Hang Duan conference called me years ago when I texted Gabe a MR that Hang asked me to roll back my timecard.  John told me I misheard Hang, which I did not.  Then the conference all was a threat to bring HR call against me for texting Gabe.  I was told if I did not drop it, the call would take place, and I did ask regarding, and it was against me, and not against Hang.  I agreed to drop it, but much later, I saw Hang was no longer with the company so I went on Linkedin, and he said HR asked him about my time card issue.  HR never connected with me about that, and I thought it was just between John Payton who coerced me, and Hang.  It was later that I had to bring it up with HR and inquire how come they never made things right, and used it against Hang.  How did they find out about it as I was coerced to drop it?  It does appear HR is not being truthful in some situations.

Those are minor things from years ago.  I got much more recent examples and worse examples from Nielsen management behavior that are illegal.

 **Sandee Crossley**                                                    Fri, Apr 5, 2:55 PM (10 days ago)  ☆  ↰  ⋮
to Tanner, Angela, Chris, Josh, Tania, me ▾

Hi Frank, I notice you are copying me on a large number of emails today. I wanted to reach out to you to see if you are seeking any action from me or merely copying me so that I am aware of the current correspondence occurring today.  Typically people on a Cc: portion of an email are more of an FYI but I wanted to reach out to see if there is something that I can do to assist you? I don't want to pass up an opportunity to help you; if I can or if you need me. I can be reached at 727-412-4032.

Thank you,
Sandee

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

On Fri, Apr 12, 2019 at 4:49 PM Shannon Buggy <shannon.buggy@nielsen.com> wrote:

Hello Frank,

My understanding is that there have been numerous attempts by Nielsen's HR, management and workers' comp teams to have an interactive dialogue with you on your request to be reassigned to a driving role. If that is inaccurate, please provide me with your understanding of the situation.

If not, it may be helpful to have a third-party mediate this matter, which the EEOC may decide to do. Nielsen wants to continue an interactive dialogue in a respectful and constructive manner. Please inform which avenue you prefer with these conditions to continue our dialogue on your medical issue, reported to Nielsen on March 18, 2019.

Kind Regards,

Shannon Buggy

---------- Forwarded message ---------
From: **Frank Liu** <frank.liu@nielsen.com>
Date: Tue, Apr 9, 2019 at 10:44 PM
Subject: Re: Connecting
To: Shannon Buggy <shannon.buggy@nielsen.com>


Hi Shannon,

Since I am not allowed to work even though I have a doctor's note clearing me to work, and Tanner has asked me not to clock work such as when I called him back on my timecard, I think I will need to go to the EEOC and the labor board. Tanner has stated things such as the MR Leader will review when I can go back to work, but it appears the MR Leader was never part of the decision process. They even pinned it on Josh Hummel who I know is not the MR leader. It also appears Anglea who is the MR leader was never consulted.

I am reporting Nielsen since I can not tell you about it as that would be considered working. Hopefully a government investigation will shed light on the issue. I am not even allowed to submit 2 week old timecards, or work on expense book that is overdue. Clear case of retiallation, coercion, discrimnation, and I do have the evidence to back it up. Thank you.

On Tue, Apr 2, 2019 at 8:41 PM Shannon Buggy <shannon.buggy@nielsen.com> wrote:
--
Sincerely,
Frank Liu
Membership Representative
US Television Audience Measurement
702-232-5069
www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

--

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

--

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

--

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

--

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

--

Sincerely,

Frank Liu

Membership Representative

US Television Audience Measurement

702-232-5069

www.nielsen.com/tvhomes



*CONFIDENTIALITY NOTICE: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

# Exhibit D

**(Nielsen employees talking online about layoffs. Many posts appear racially charged. Posts screenshoted from www.layoffs.com. Many of the racist posts may have been deleted by moderators by now.)**

# Diversity...Puhleease 



For a company that preaches inclusivity and cultural diversity, Nielsen seems to greatly favor Indians. Ever since Karthik and Sujit took over Gracenote has been transitioning to a mainly Indian workforce. Most engineering is now in India; Editorial... — read more

8h ago by Anonymous

**4 replies** (last 7m ago)

523 views | 16 reactions (+13/-3)

Post ID:  @OP+1qTAL4w8

+10

It's not just Gracenote @OP+1qTAL4w8.
Microsoft, Google, Adobe, Meta, Tesla,
IBM, Amazon are mostly Indian now. They
used to be 50% Indian 50% Chinese, they're
now 70% Indian 30% Chinese. They have
been kicking them out just as they did at
Nielsen.

In New York, it used to be mainly 7-Eleven
and Motels, now Subway, CVS Pharmacy,
Walgreens, everywhere is Indian. As tech
companies move entirely to India, where
it's cheaper, Indian H1Bs themselves are
getting slowly eliminated so they started to
move to low tier industries including
Walmart. Even Kwik-E-Mart was taken over
by Apu Nahasapeemapetilon at some point.

Karthik didn't become CEO because he's
exceptional or smart. He's there to ensure
Nielsen becomes 100% Indian as instructed
from above.

It's beyond me how Americans accept this
knowing there is no future for their kids.
Well beyond me.

# Have u noticed that all posts about India have vanished?



i wonder why

3h ago by Anonymous

no replies yet

177 views | no reactions

Post ID:  @OP+1qUTG9xQ

0

---

Im with u, i work 16 years here, its fine.



But its all very exhausting
2010 it was Outsourcing to india - a Desaster
2013 it was Outsourcing to Turkey - same Desaster
Since then we had multiple layoffs
Again last year january and now again india.
it's exhausting

6h ago by Anonymous

8 reactions (+7/-1)

Post ID: @ngi+1qU1REJO

 **+6** 

POST ID: **@1xhd+1qUTG9**

"And what's the point of telling h1b visa Indians with the kids to go join the south border as illegals that is uncalled for."

You're mixing up posts, someone else said that. There are many people commenting with different views. Free speech.

H1Bs are as problematic as taking jobs inside India. American tech companies are predominantly Indian, why? because H1Bs get priority in hiring and they're imported in mass. u think there is a shortage of tech workers? it's a big lie. Americans are finding it so hard to find a job these days because of the mass importation of H1Bs. You're talking thousands upon thousands each and every year.

u think an American employee can't run a SQL query? give me a break. Programming was invented right here in America. Tech itself is an American invention. Why not hire Americans to do it?

55m ago by Anonymous

"You can be a racist if you want. I just called out it was offensive."



Talking about moving American jobs in mass to India is a sensitive topic for Indians because they're the beneficiary, but it's an important discussion for Americans. If jobs go to India, where are Americans going to work?

You call this racism, I don't get it.

2h ago by Anonymous

2 reactions (+1/-1)

Post ID: @1cfr+1qUTG9xQ



# Hmm Conglomerate!



If Nielsen was threatened to be broken up prior to internet ratings and expanding globally. Shouldn't it definitely be considered a Conglomerate now?
Keep U.S. ratings in the U.S., I know families don't watch this overrated junk and sticks to values. I say these other countries are trying to make USA look worse to everyone else and giving the good stuff Poor Ratings!

1h ago by Anonymous

**2 replies** (last 8m ago)

93 views | 1 reaction (+0/-1)

Post ID: @OP+1rbzAAca

 **-1** 



# Global Centers of Excellence? India's average IQ is 77

https://www.worlddata.info/iq-by-country.php

1h ago by Anonymous

**1 reply** (last 1h ago)

53 views | 5 reactions (+3/-2)

Post ID: **@0P+1re2oju3**

⬆ **+1** ⬇

## 3 replies (most recent on top)

Don't go through the humiliation of training your Indian replacement.
You are likely going to have to find a new job. Search now... severance doesn't really matter unless you want to retire

2h ago by Anonymous

3 reactions (+2/-1)

Post ID: **@1uty+1reNnca0**

⬆ **+1** ⬇

## Low quality replacements 

The lack of critical thinking and common sense that these replacements have is astonishing. Can't think outside the box, need to be spoon fed, communication in English is horrible. You give them a book and tell them to turn to page 26, they say "ok sure" but then just sit there. You literally have to show them how to open the book and turn the pages.

You can tell they use ChatGPT or some AI to translate, their responses don't even make sense.

Bro, why are you responding to me like you are reciting a 16th century novel broken into fragmented sentences. Just tell me you downloaded the file and move on to the next task, wtf.

2h ago by Anonymous

## Have u noticed that all posts about India have vanished? 

i wonder why

9h ago by Anonymous

**13 replies** (last 41m ago)

653 views | no reactions

Post ID: @OP+1qUTG9xQ

# 7 replies (most recent on top)



*Why do you assume that cheaper labor is worse labor? Is there anything special about what you do that can't be outsourced?*

Yes, I can speak native, unbroken English to the ad account executive in New York who just spent over $150K on one study.

11h ago by Anonymous

3 reactions (+3/-0)

Post ID: **@1cur+1riRiQ5U**

+3

Exhibits respectfully submitted,

Dated 3/4/2024                    Frank Liu

                                 Pro Se Plaintiff