Frank Liu
304 S. Jones Blvd #3416
Las Vegas, NV 89107
818-835-0498
frank.liu.96@gmail.com
Pro Se Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Frank Liu<br><br>    Plaintiff,<br><br>    vs.<br><br>The Nielsen Company (US) LLC<br><br>    and<br><br>TNC US HOLDINGS<br><br>    Defendants. | **Case #1:22-cv-09084-JHR-OTW**<br><br>**SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

1  
2  **Introduction**……………………………………………………………………….3  
3  **1. Discrimination through Disparate Treatment or Disparate Impact**……..3  
4  **2. Racial Discrimination**……………………………………………………….5  
5  **3. Retaliation**………………………………………………………………….....8  
6  **4. Wage Violations**……………………………………………………………...11  
7  **Liu's Response to Nielsen's Position Statement Submitted to the EEOC**…….12  
8  **Liu Believes he Successfully Stated His Claims**………………………………...12  
9  **The Correct Dockets are 6 and 6.1.** ……………………………………………….13  
10  **Liu Asserts his Claims are NOT Time-Barred**……………………….………...13  
11  **Anita Pancholi claims Nielsen does not have an Arbitration Policy**…………..15  
12  **Conclusion**……………………………………………………………………...17  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28

# INTRODUCTION

Plaintiff asserts his claims are not time barred due to equitable tolling, estoppel, promissory estoppel and other arguments laid out in the both Plaintiff's Amended Complaint (ECF 44), and Plaintiff's Response to Defendants' Motion to Dismiss (ECF 75).

In ECF 77, Defendants argue that Plaintiff hasn't succeeded at stating a claim for his lawsuit. Plaintiff asserts he has successfully asserted all of his claims in his Amended Complaint (ECF 44). Because Defendants have misrepresented Plaintiff's claims, Plaintiff will summarize each of his claims.

**1. Discrimination through Disparate Treatment and/or Disparate Impact**

During Liu's employment, The Nielsen Company passed off different Asian households to Plaintiff to recruit because Plaintiff is Asian and can speak Mandarin at a moderate level. These Asian households included homes that only spoke Vietnamese, Korean, Burmese, Cantonese and Japanese which are languages Plaintiff **does not** speak.

Nielsen's bonus program penalizes Nielsen Membership Representatives if they fail to recruit the first home selected on the list. The first home selected on the list is called a "Basic," and since Nielsen believes Basics are the most accurate home to represent a neighborhood, there are metrics that penalize membership representatives if their "initial basic rate" is low.

As an example, the first home for SPEC 1121386 is Apartment 6. If a Membership Representative fails to sign up Apartment 6 for the TV Ratings, then their "Initial Basic Rate" metric will suffer and that could lead to thousands of dollars less in monthly bonuses.



As an another example, if a Membership Representative signs 15 basics and 5 alternates homes in a month and has an "Initial Basic Rate" of 50%, the person will probably **be making less** money than a Membership Representative who signs only 12 basics and 4 alternate homes a month with an "Initial Basic Rate" of 70%. During Liu's tenure at Nielsen, there are penalties imposed for not having a high enough initial basic rate.

When a non-Asian Membership Representative goes to a basic home and finds out the home is Asian and doesn't appear to speak much English, they will immediately leave without bothering with a sales pitch, and call up the manager to have the household re-assigned to Liu for him to recruit. When Liu is assigned a Korean speaking home that speaks limited or no English, then there is a good chance that Liu will not be able to sign up the home due to language issues, and have to close out the basic as refused, thus hurting Liu's "Initial Basic Rate" which ends up hurting Liu's monthly bonuses. There are times when even a 5% decrease in initial basic rate can mean the loss of thousands of dollars for the month's bonus.

This policy of sending an Asian Nielsen Representative to recruit Asian basic households hurts Asian representatives like Liu because it limits their monthly bonus potential due to having to take the hit for not signing up a basic household when the basic households wasn't originally assigned to them in the first place.

Nielsen requires their TV Ratings homes to sign contracts for 2 or 5 years depending on the market and oftentimes the number of visits to check up on the Nielsen monitoring equipment is quite intrusive. In Liu's experience, it is a lot harder to sign up an Asian home than a non-Asian home for the TV Ratings due to privacy, multi-year commitments and sharing personal information such as income, birth dates, names of everyone in the household (including children), etc.. By targeting Liu with Asian homes, it requires Liu to work much harder than a white membership representative who is not being targeted with Asian homes to recruit.

If Liu can not speak Korean, what makes Nielsen think reassigning the home from a white Membership Representative to an Asian Membership Representative who does not

1  speak Korean will result in successfully recruiting the home?  Nielsen's bonus incentive
2  program, initial basic rate policy and their policy of reassigning Asian basic homes to Asian
3  recruiters is racist because it results in lowering the Asian recruiters' initial basic rate metric
4  and monthly bonuses, thus they have to work harder and sign up even more homes in hopes
5  to come close to the bonus they should have received had it not been for the lowered initial
6  basic rate metric.
7        Despite needing to work harder and more hours (including multiple visits) to try to
8  recruit Asian homes, Nielsen managers have directed Liu to roll back his time card to make
9  his work time less because for each hour Liu exceeded 40 hours, it would qualify for
10  overtime pay.  Examples of manager who directed Liu to roll back his time card or not to
11  clock time worked are Hang Duan and Tanner Tate.
12
13  **2. Racial Discrimination**
14        The Nielsen traveling team is known as the "SWAT team" and is comprised of
15  membership representatives and field representatives.  It is a fairly small team of top
16  performers.  Liu was a membership representative meaning he worked to recruit households
17  to participate in the Nielsen TV Ratings.
18        Tanner Tate took over the SWAT team in late 2018.  In 2019, the team was mainly
19  comprised of older white females.  Several of the older white females (such as J Tracy
20  Booth and Lisa Schuerenberg) spoke negatively about Asian households and made fun of
21  them.  Tanner Tate allowed white female membership representatives to make anti-Asian
22  comments on conference calls and in the group text chat.
23        Although Nielsen SWAT Membership Representatives were mainly sent separately to
24  work in different markets so they don't work in the same city/state at the same time, in
25  2019, all SWAT membership representatives were sent to work in the NY LPM market
26  because the market was greatly under-installed in terms of home count and needed to
27  immediately boost the number of homes participating in the ratings.  Lisa was assigned a
28  basic home that turned out to be Asian and wanted Liu to take the home from her because

she did not want to be hit with a refusal for her "initial basic rate". Her friend, J Tracy Booth went on the team text chat and posted a picture of Chinese Americans taken in New York's Chinatown to mock Chinese people and the text was directed at Liu because Lisa was upset that Liu didn't want to take over her assigned work and had told J Tracy Booth about it. After Lisa complained to Nielsen management that Liu didn't want to take Lisa's Asian home, Nielsen management assigned the Asian home to Liu anyway to recruit because Liu was Asian and the logic was an Asian membership rep should be the one recruiting an Asian home despite the fact that there may be language issues because Liu doesn't speak Cantonese, and the household was located in a secured building that makes it difficult to access.

The make up of the SWAT Membership Representative in March 2019 is shown below with the help of an email Tanner Tate sent. As you can see there were only 5 active members, and 4 of them were white females.



Even though Liu was the top performers of the SWAT team, in 2019, Tanner Tate gave Liu a bad annual review for the year prior. The annual review was about the prior year performance in 2018 where Liu had the 5th most sign ups in the nation (among all membership representatives company wide). Liu estimates there were about 200 or so membership representatives nationwide at the time.

White people on the team with less sign ups than Liu received a higher annual review score. Tanner Tate was not Liu's SWAT manager for most of the 2018 year because he only took over in late 2018 after the previous manager got promoted into a different position.

1  Tanner Tate is a racist because he called Liu a chink.  Furthermore, he has a history of racist
2  tweets.



12  Tanner Tate discriminated against Liu by calling Liu a chink.  Tanner Tate also
13  discriminated against Liu by giving Liu a low score for his annual review despite Liu being
14  a top performer nationwide at Nielsen.  Liu had more signs than white women on the SWAT
15  team who received higher score reviews.
16  Tanner Tate allowed white females on his team to make racist anti-Asian comments
17  during weekly conference calls and in the team's group text chat.



1  Lisa was upset that Liu didn't reach out to her to take the
2  Asian home from her and informed J Tracy Booth who is a friend
3  of hers on the team.  The white women are in what appears to be
4  a clique and talk crap about Liu who is the only minority on the
5  team.
6  In support of Lisa, J Booth went into Chinatown and took a
7  picture of a crowd of Chinese people and posted it in the teams'
8  text thread.  The messages were insulting and directed at Liu
9  because Liu had not responded to Lisa because he was busy and
10 didn't want the refusal which would affect his "initial basic rate"
11 metrics.
12 Tanner Tate defended the texts which were directed at Liu.  Because Tanner Tate
13 allowed racist comments to take place, and Liu had enough and was upset, he reached out
14 and forwarded the racist texts to Nicole Hunter who was the Regional Operations Leader on
15 March 4, 2019.  On March 5, 2019, Nicole Hunter responded back to Liu regarding the
16 incident.

17  ---------- Forwarded message ---------
    From: Angela Hunter <nicole.hunter@nielsen.com>
    Date: Tue, Mar 5, 2019 at 9:21 PM
    Subject: Re: Racist chat
18  To: Frank Liu <frank.liu@nielsen.com>

19  Frank,
    Thank you for bringing this to my attention. We will be back in touch with you.
20  Nicole

21
    Nicole Hunter
22  Regional Operations Leader
    US Watch-Midwest
23

24 **3. Retaliation**
25  On February 20 of 2019, Tanner Tate called Liu a chink.  If it was just that one
26 incident, Liu probably would have let it go.  However, Tate allowed members of his SWAT
27 Membership Representative team to talk bad about Asians, talk crap about Liu which
28 contributed to a hostile work environment, so Liu decided to reach out to a higher manager.

Although Nicole Hunter responded to Liu on March 5, 2019, she didn't appear to do much of anything to rectify the situation after Liu forwarded her evidence of racist team text messages.   Liu also reached out to Nielsen's Chief Human Resources Officer, Nancy Phillips who replied back to Liu on March 7, 2019.

> ---------- Forwarded message ----------
> From: Nancy Phillips <nancy.phillips@nielsen.com>
> Date: Thu, Mar 7, 2019 at 2:33 PM
> Subject: Re: Team chat comments follow-up
> To: Frank Liu <frank.liu@nielsen.com>
> CC: Chris Gordon <chris.gordon@nielsen.com>
>
> Frank,
>
> Just confirming that I have received your messages and will ensure they get into the right hands for follow up.  Someone will reach out shortly.
>
> Thanks,
>
> Nancy

. Liu sprained his ankle on March 14, 2019 while recruiting homes in Newark, NJ. He emailed pictures of his sprained ankle to Tanner Tate on March 18, 2019. Tanner Tate was OK with Liu continuing to work and recruit homes.  Eventually Liu had enough of the hostile work environment and emailed Nancy Philips on March 20, 2019 telling her that he was going to file a report with the EEOC in regards to harassment, discrimination and retaliation. Nancy Philips still refused to speak to Frank Liu about his concerns.

On April 1, 2019, Tanner Tate and Nielsen's workers compensation ambassador told Liu that he could no longer work anymore until he saw a doctor about the sprained ankle. Liu saw a doctor and then a podiatrist and received a return to work letter.  At first Tania Rosello (Nielsen's Workers Compensation Ambassador) accepted the return to work letter, but the next day she changed her mind because the return to work letter required Liu to wear an ankle brace and suggested "if possible" for Liu to limit his walking.

Some time later, Nielsen directed Sedgwick Claims management to deny Liu's workers compensation claim.  Liu didn't have personal insurance and needed Nielsen to pay for a doctors visit so he can get a full return to work letter that had no restrictions.  Because Nielsen filed the workers compensation claim in Nevada, Liu contested that decision because the injury occurred in New Jersey.  The claim was eventually reopened and Liu was allowed to go to Concentra Urgent Care in West New York, NJ for a doctor's visit so he

could get a full return to work letter that had no restrictions.  After Liu got the full return to work letter and texted it to Tracy Staines (SVP Human Resources), Liu was immediately terminated a couple hours later.



On the termination call, Liu even inquired if they received his "formal complaint against Tanner Tate" email which mentioned there was racism, discrimination and retaliation at Nielsen because they had previously refused to acknowledge receiving Liu's email.  That email was sent mere days before Liu's termination and one of the recipients Liu emailed it to was Nielsen's CEO David Kenny.

Nielsen's middle management (eg. Nicole Hunter) didn't appear to do anything to address Liu's concerns.  Nielsen's senior management (Nancy Phillips) refused to speak to Liu.  Because of Liu's persistence and wanting to speak out about racism, discrimination and retaliation at Nielsen, the company decided to prevent Liu from working even though they were previously fine with Liu working with a sprained ankle.  Nielsen rejected a return to work letter, then denied Liu's workers compensation claim.  Liu was able to have the workers compensation opened in NJ where the injury took place, and after he received a full return to work letter without restrictions and texted it to Tracy Staines, Nielsen terminated Liu anyways hours later.  Liu believes there was collusion between management and different levels of human resources in order to get rid of Liu because Nielsen wanted to protect a racist manager - Tanner Tate.

1  After Liu was terminated, he discovered racist tweets posted by Tanner Tate and
2  emailed Nielsen's human resources, managers and David Kenny about it.  Nielsen refused
3  to take action against Tate and instead eventually promoted Tanner Tate to an even higher
4  position at Nielsen.



11  3.

### 4. Wage Violations

15  Nielsen management has directed Liu to roll back his time card to reduce Liu's
16  overtime pay during Liu's employment at Nielsen.  In addition, Tanner Tate directed Liu not
17  to clock some of his work done.  Furthermore, Nielsen's time card system frequently failed
18  to record all the time inputted due to what appears to be a syncing bug within their Mobile
19  Time Trak system.

20  The fact that Nielsen management directing employees to not clock all of their work
21  performed is no secret.  This is a common problem company wide.  As an example, on May
22  18, 2024 it was reported that Nielsen settled a class action lawsuit where Nielsen employees
23  sued because they weren't properly paid for their time worked.

24  According to the article, "Marquez worked for Nielsen from June 2018 through
25  March 2022 and her duties included recruiting, signing and providing services to
26  households of people who allow their television and radio viewing listening to be monitored
27  so that Nielsen can use the data to compile ratings, according to the suit."

In addition, the article mentions, "the employees were frequently asked to work outside their work hours without compensation, were not paid complete monies due for overtime and missed meal and rest breaks and also did not always get reimbursed for out-of-pocket business expenses, the suit alleged."

Furthermore, the article mentions, "'(Nielsen) also implemented policies that prohibited (Marquez) and the class members from accurately recording the actual time worked, resulting in a failure to pay plaintiff and the other (proposed) class members all wages owed,' the suit alleged."

The article can be seen here: https://mynewsla.com/hollywood/2024/05/18/settlement-in-principle-reached-in-suit-vs-nielsen-ratings-service/

Liu has had similar experiences of what was described in that article because Nielsen management told Liu to roll back his time card and not to record time worked. Furthermore, there were also syncing issues that reduced clocked time due to a bug in Nielsen's Mobile Time Trak.

Because of Nielsen management's instance that Liu limit his overtime and to roll back his time card, Liu complied. Liu would frequently roll back his time card throughout his employment to make his work time less in order to satisfy Nielsen management.

**Liu's Response to Nielsen's Position Statement Submitted to the EEOC**

Because Nielsen continues to gaslight Liu by alleging Liu's original lawsuit was "single cause of action," Liu is attaching an **Exhibit A** to his Sur-Reply. The Exhibit contains more information about Liu's claims. There are 9 additional parts that was submitted to the EEOC, but for simplicity's sake, Liu is only attaching the first part.

**Liu Believes he Successfully Stated His Claims**

In addition to reviewing this filing, the Court should look at the Amended Complaint (ECF 44) and Exhibits in Support of Amended Complaint (ECF 44-1) and also the Exhibits

in Support of Plaintiff's Sur-Reply to see that Liu's claims are valid.  **However if the Court determines that Liu has not sufficiently stated his claims, Liu requests the Court give him leave to amend his complaint** because there is a lot more materials Liu can use to support his lawsuit.

As an example, there are also videos that can support Liu's claims on his YouTube channel such as the audio of when Liu was terminated at Nielsen which is available here:

https://youtu.be/J26u_Poxnkk?si=KQD-UDPaG9TuoLEg

Furthermore, there are also a number of other calls that were recorded during Liu's employment at Nielsen and shed light into what happened before Liu was terminated.

https://youtu.be/h8m925D93Xg?si=xAAIBhGv7j3aheqW

https://youtu.be/XqbLC7zv6FY?si=H31SWgryPcmxuVHi

https://youtu.be/DG2kTTlGJtg?si=CzAgHvEmnqTZRR0J

https://youtu.be/UjkN-48_xaM?si=O3ZM_7NUi_wAFAXH

**The Correct Dockets are 6 and 6.1.**

Plaintiff incorrectly referenced Dockets 5 and 5.1 throughout his Response to Defendants Motion to Dismiss (ECF 75).  The correct dockets are ECF 6 and 6.1.  Plaintiff apologizes for getting the docket numbers mixed up.

**Liu Asserts his Claims are NOT Time-Barred**

Liu has already asserted why his claims are not time barred in ECF 44 and ECF 75. Furthermore, Liu filed his lawsuit within the EEOC's 90 day right to sue letter in the Northern District of California.  Liu did so in good faith despite Defendants' actions of concealment.  As mentioned, Nielsen tricked the EEOC into believing Liu's employment files were under EEOCS's Tampa Field Office's jurisdiction to prevent the EEOC case from transferring to New York.

Another example mentioned in ECF 75 is that Liu's 2019 W-2 lists an address in Connecticut as Nielsen's company address.  For the prior W-2 years, Nielsen's company

1  address was always located in New York.  The change of Nielsen's address on Liu's W-2 is
2  another issue that confused Liu on where to file his initial lawsuit.
3      Another example of Nielsen's actions that were meant to deceive plaintiff was on
4  December 29, 2021, Cardelle Spangler even tried to trick Plaintiff into having the lawsuit
5  transferred to the Middle District of Florida as per her email stating they believe venue is
6  proper in the Middle District of Florida (**Also see Exhibit B**).



12  Cardelle Spangler alleges the majority of the witnesses and documents are located in the
13  Middle District of Florida.  This is incorrect.  In fact, it was later discovered that Liu's
14  employment records are not even stored in Florida as Nielsen previously asserted to the
15  EEOC in order to prevent Liu from having his EEOC case transferred to the EEOC's New
16  York field office for investigation.
17      Liu has never been a resident of Florida.  Furthermore, it wasn't until January 3, 2022
18  that Nielsen stated Liu's employment files are stored in The Netherlands according to a
19  declaration from Nielsen's General Council Anita Pancholi (**Also see Exhibit C**)



26      Today, Ms. Pancholi is no longer at Nielsen.  Nielsen's Chief Operating Officer
27  Karthik Rao (who is a married man with kids) had an affair with Anita Pancholi, and during

that time, Anita Pancholi was promoted from Associate General Council to General Council.

The NY Post broke the story here: https://nypost.com/2021/12/07/nielsen-tv-ratings-exec-faced-ethics-probe-over-affair-with-company-lawyer/

Here is an excerpt from the NY Post article:

> The internal probe — sparked by an anonymous whistleblower — found that Chief Operating Officer Karthik Rao didn't violate the company's code of conduct, sources said. But the alleged affair with the Nielsen lawyer — who also got a promotion during the trysts — has raised eyebrows during an era of "Me Too" corporate scrutiny.

The reason for bringing this up is that Nielsen alleges that after Liu was terminated they investigated Liu's complaints and claimed to have found no wrongdoing. Liu does not believe Nielsen really investigates things, and does not care much about stopping unethical conduct within its leaders. Karthik Rao was cleared of wrongdoing despite sleeping with a Nielsen lawyer. During the time of Rao's affair, Anita Pancholi was even promoted with a raise. For Karthik Rao, he ended up being promoted to become Nielsen's CEO in September of 2023 to replace David Kenny.

Furthermore, Plaintiff believes Anita Pancholi was involved in misleading the EEOC to believe Liu's employment files were located in Florida. However, in 2022, Anita Pancholi finally revealed Liu's employment files are actually stored in The Netherlands.

**Anita Pancholi claims Nielsen does not have an Arbitration Policy**

After Liu was terminated, he inquired about Nielsen's arbitration policy because he recalls it was mandatory to agree to one. On May 30, 2019, Anita Pancholi stated Nielsen does not have an arbitration policy, and will not agree to "arbitration" of claims.



1   Liu's lawsuit filed in the Northern District of California was dismissed for lack of
2   personal jurisdiction because Nielsen alleged the district did not have personal jurisdiction
3   over them.  This is very interesting because in Justin Franks' lawsuit filed in the Western
4   District of Washington, Nielsen is trying to force Justin Franks into arbitration in Northern
5   California.  Justin Frank's lawsuit is Case 3:23-cv-06150-TMC.  Here is an expert of ECF
6   24 of Justin Franks' lawsuit from Nielsen's Motion to Compel or Dismiss which attempts to
7   force Justin Franks to go to arbitration in Northern California.



12   Here is another excerpt:

17   Cardelle Spangler is also a lawyer (admitted as pro hac vice) representing Nielsen in
18   the Justin Franks lawsuit.  It's interesting that Anita Pancholi claimed Nielsen does not have
19   an arbitration agreement in 2019, and Nielsen claims Northern District of California does
20   not have personal jurisdiction over Nielsen, but in May of 2024, Nielsen is trying to force
21   arbitration on Justin Franks who resides in Washington State to arbitrate his claims in
22   Alameda which is a county located within the Northern District of California.
23   Liu believes he was forced to agree to an arbitration policy when employed at
24   Nielsen.  Anita Pancholi claimed Nielsen does not have an arbitration policy, but what is
25   interesting is that Nielsen managers have commonly used the word "arbitrate" when it came
26   to employment related issues such as regarding monthly bonuses.  Another example is
27   before Tanner Tate took over the SWAT team, Liu's manager was Luke Berglin.

In 2017, Liu's rental car was towed during a work trip. Liu raised the issue about being reimbursed for the tow fee as he was on a work trip and parked on the street instead of at the hotel he was staying at in order to save the company money so Nielsen wouldn't have to pay for expensive hotel parking during the trip. Luke Berglin stated he will attempt to arbitrate the issue with Nielsen. Here is Berglin's email that Liu forwarded to Liu's own personal email address:

> ---------- Forwarded message ---------
> From: Luke K Berglin <luke.berglin@nielsen.com>
> Date: Mon, Dec 11, 2017 at 6:44 PM
> Subject: Re: Parking sign
> To: Frank Liu <frank.liu@nielsen.com>
>
> Understood. I am attempting to arbitrate. Will keep you posted.
>
> Sent from my iPhone

If Nielsen didn't have an arbitration policy, why would Luke Berglin mention trying to arbitrate the issue? Liu remembers being forced to agree to arbitration. Nielsen claims there is no arbitration policy, however they are trying for force Justin Franks into arbitration.

## Conclusion

Defendants have tricked both Plaintiff and the EEOC on where Liu's EEOC case belonged in order to prevent the EEOC case from transferring to New York. Furthermore, Cardelle Spangler has misrepresented where the lawsuit should be brought by alleging it should be filed in the Middle District of Florida despite Liu having no connections to Florida (**See Exhibit B**). Nielsen has time and time again acted with deceit. Liu's original lawsuit was filed within the 90 day right to sue letter in the Northern District of California (case #4:21-cv-07313-JSW). After the Northern California lawsuit was dismissed, Cardelle Spangler used estoppel and promissory estoppel tactics to stop Liu from appealing the lawsuit's dismissal to the Ninth Circuit within the 30 days allowed by law. Liu wanted the Northern District of California District Court to transfer the lawsuit to SDNY instead of dismissal.

Nielsen has violated NY General Obligations Law Section 5-336 by trying to force Liu to first agree to an amount for settlement, then bombarding Liu with different settlement drafts with each draft further and further restricting Liu's rights in an attempt to silence Liu from speaking out about the discrimination he experienced at Nielsen which is in violation of NY law.

After the lawsuit was refiled in SDNY, Hon. Judge Wang set up calls for mediation. Liu does not believe Nielsen came to mediation in good faith either. Nielsen offered a very low sum to settle and further tried to silence Liu in violation of NY GOL 5-336. There has never been any offer that Nielsen presented that did not require Liu to be silenced from speaking out about the racism, discrimination and retaliation he experienced at Nielsen.

Plaintiff believes not only should this court recognize the bad faith tactics of Defendants, this Court should take into account the prejudice that Nielsen has caused Plaintiff and allow Liu's lawsuit to proceed based on equitable tolling, promissory estoppel and estoppel. Furthermore, <u>if the Court sees that Liu has failed to state any of his claims, Liu asks the Court to grant him leave to submit a Second Amended Complaint</u>. This are a lot of evidence and documents that Liu has not used yet to show there was racism, discrimination, retaliation at Nielsen and how Nielsen's actions violated federal and state wage laws.

Respectfully submitted,

*/s/ Frank Liu*

Dated 5/24/2024

Frank Liu

Pro Se Plaintiff