**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
FRANK LIU,                                                :
                                                         :
                              Plaintiff,                  :
                                                         :          22-CV-9084 (JHR) (OTW)
              -against-                                   :
                                                         :          **REPORT & RECOMMENDATION TO**
THE NIELSEN COMPANY (US) LLC and TNC (US)                :          **THE HONORABLE JENNIFER H.**
HOLDINGS,                                                 :          **REARDEN**
                                                         :
                              Defendants.                 :
                                                         :
----------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

I.      **INTRODUCTION**

Plaintiff Frank Liu brings this action *pro se* against The Nielsen Company (US) LLC

("Nielsen") and TNC (US) Holdings ("TNC") (collectively, the "Defendants") for race

discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), disability

discrimination under the Americans with Disabilities Act of 1990 ("ADA"), failure to pay wages

under the Fair Labor Standards Act ("FLSA"), and race discrimination, disability discrimination,

and retaliation under the New York State Human Rights Law ("NYSHRL"). (ECF 44). Defendants

moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (ECF Nos. 53, 54).

Defendants' motion has been referred to me for a Report & Recommendation. (ECF 90). For the

following reasons, I respectfully recommend that Defendants' motion to dismiss be **GRANTED**

**IN PART** and **DENIED IN PART**.

## II.    BACKGROUND

### A.  Factual Background

Nielsen is a data, marketing, and media analytics measurement firm best known for the "Nielsen ratings," an audience measurement system.[1] Liu is a person of Chinese-American descent who was employed from 2017 to 2019 as a "membership representative," where his responsibilities included going door-to-door to recruit households to enroll in Nielsen's audience measurement system. (ECF 44 at ¶¶ 7, 35, 46). Membership representative compensation, specifically bonuses, were tied to the number of households signed up. (ECF 44 at ¶¶ 8, 46). Liu's claims are based on a series of incidents that occurred in 2019 that culminated in his termination on April 23, 2019.

#### 1.    *Liu is assigned more "Asian" households than other membership representatives*

Liu speaks Mandarin "at a moderate level." (ECF 44 at ¶ 52). Liu alleges that, throughout his employment with Nielsen, he was sent to recruit in areas identified as "Asian" because of his race and ethnicity. *Id.* In addition, if another membership representative encountered an "Asian" household that did not speak English, Liu would be reassigned to that area. *Id.* Many of the households in "Asian" areas Liu was assigned to, however, spoke Cantonese, Korean, Vietnamese, Japanese, or other languages Liu does not speak. *Id.* Liu alleges that he was penalized for not signing up homes in "Asian" areas through lower bonuses and recruitment metrics. *Id.*

---

[1] Nielsen, *About Nielsen* (Sept. 23, 2021), https://www.nielsen.com/about-us/about/.

At some point during his employment, Liu complained about the policy of assigning him to "Asian" areas, and was told that it was permissible because Liu received a language pay incentive for speaking Mandarin. (ECF 44 at ¶ 53). Liu attempted to get his language incentive removed so he would no longer be assigned disproportionately more "Asian" households. *Id.*

2. *The February 20, 2019 incident*

On February 20, 2019, Liu participated in a conference call on which his manager, Tanner Tate, told Liu to "stop talking" and told him that "he [could] not talk for the rest of the call[,] which humiliated Frank Liu in front of the other teammates." (ECF 44 at ¶ 9). Following the conference call, Liu privately expressed to Tate that he had found Tate's behavior "dismissive and aggressive." *Id.* Tate ended the conversation to join another conference call and offered to continue the discussion at a later time. *Id.* Liu declined the offer as he felt it would not be productive. *Id.*

Nevertheless, later that same day, Tate called Liu. (ECF 44 at ¶ 10). On that call, Liu again informed Tate that he had felt "humiliated" on the earlier conference call and "it was rude how he was treated." *Id.* Tate replied, "Don't be a chink."[2] *Id.* Liu told Tate that this comment was racist. *Id.* Tate dismissed Liu's concern and "threatened" Liu that, if he reported the usage of the slur to Human Resources, they would not believe Liu. *Id.*

Following these conversations with Tate, Liu began to suffer from anxiety that caused him to no longer speak on conference calls unless told to. (ECF 44 at ¶ 11). Liu limited his

---

[2] Defendants refer to this statement as the use of a "racial term." (ECF 54 at 2). Lest there be any confusion moving forward in this case, the word "chink" is a racial *slur*, not a racial "term." Furthermore, it is a slur that is still unfortunately used to demean people of Asian descent well into the present day. *See* Cathy Park Hong, "The Slur", *The New York Times* (Apr. 12, 2020) (describing the "resurgence" of the slur during the COVID-19 pandemic).

participation on calls to using Google Hangouts to type responses. At a subsequent annual

review on March 20, 2019, Tate criticized Liu for his lack of engagement in conference calls and

graded Liu an "inconsistent contributor." (ECF 44 at ¶ 55). Liu alleges that he had "the most sign

ups on his team and had the 5th most [sign ups] nationwide for the evaluation period" and that

other membership representatives on his team received higher evaluations. *Id.*

### 3. The March 4, 2019 incident

On March 4, 2019, one of Liu's teammates, J.B., made comments in a group text thread

that Liu found offensive and racist against people of Chinese descent.  (ECF 44 at ¶ 12).

Specifically, J.B. texted: "I'm in Chinatown!" ; "[L.M.], want me to get you a translator?"; "I see

many," followed by a picture of several people of Asian descent standing on a street corner.

(ECF 89-1 at 33). L.M., another of Liu's teammates, replied: "Tracy pick me up a Chinese

translator please and can I expense it[.]" *Id.*

Liu then responded: "I think this Chinese translator thing is directed at me with multiple

people chiming in, but I have emailed Tanner about my reluctance to speak to anyone." ; "Also

not all Chinese people are translators. That is racist." *Id.* Tate responded: "I don't think anyone

was being racist Frank." ; "I believe she was referencing the possibility of finding a Mandarin, or

Cantonese translator since she is in Chinatown. So let's de-escalate and drop the subject from

this text thread." *Id.* Liu texted: "I was definitely offended by the context the emoji and saying

she sees many without seeking one up [sic], but will drop it on your request in chat." *Id.*[3]

---

[3] In Exhibit 1 to his Sur-Reply, Liu also alleges that L.M. had, on one occasion, imitated the Chinese language
spoken in a home by using the sounds "ching, chong, chow." (ECF 89-1 at 33).

### 4. Escalation to HR

In or around early March, Liu contacted Nancy Philips, Nielsen's Chief Human Resources Officer, to begin the process of reporting the February 20 and March 4 incidents. (ECF 44 at ¶ 13). Philips redirected Liu to another HR employee, Sandee Crossley, who Liu alleges was "dismissive" and "did not respect [his] request for anonymity as she put a HR conference call invite in [his] google calendar which would be easily seen by Tanner Tate." *Id.* Liu was fearful of retaliation for reporting the incidents to HR. *Id.*

On March 20, 2019, Liu informed Philips via email that he was going to file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging harassment, discrimination, and retaliation. (ECF 44 at ¶ 15). Liu was redirected to Shannon Buggy, Senior Vice President of Global Human Resources. *Id.* On April 1, 2020, Liu was told by Tate and Tania Rosello, a worker's compensation ambassador at Nielsen, not to return to work until he had seen a doctor about Liu's ankle injury, which had occurred on March 14, 2019. (ECF 44 at ¶ 17). *See infra* Section II.A.5. On April 2, 2019, Liu contacted Buggy about his EEOC complaint and was told by Buggy that they could not speak until Liu had been cleared to return to work because speaking to HR would be considered paid work. (ECF 44 at ¶ 18).

### 5. Liu's ankle injury and attempts to return to work

On March 14, 2019, Liu sprained his ankle while out recruiting homes in the New York market. (ECF 44 at ¶ 14). Liu emailed a photo of his ankle to Tate on March 18, 2019. *Id.* Tate told Liu he could continue working. *Id.*

On April 1, 2019, Tate and Rosello told Liu he could not come back to work until he saw a doctor about his ankle. (ECF 44 at ¶ 17). Liu went to a doctor (who is not named in the

Amended Complaint), who performed an x-ray and confirmed Liu's ankle was not broken. *Id.*
After Liu informed Tate and asked to return to work that day, Tate and Rosello told Liu that he
could not return to work without a return to work letter. *Id.* The hospital Liu had visited did not
provide return to work letters, and Liu was referred to a podiatrist. *Id.*

On April 4, 2019, Liu saw Dr. Patel, a podiatrist. (ECF 44 at ¶ 19). Dr. Patel provided Liu
with a return to work letter and told Liu he could return to work with an ankle brace, and to
limit walking "if possible." *Id.* Liu informed Rosello following the appointment, and Rosello told
Liu the doctor's letter was adequate for him to return to work, but that "he should work out the
'if possible' part with Tanner Tate." *Id.*

A lengthy back-and-forth followed between Liu and Nielsen. Liu alleges he was
"prohibited" from going back to work unless he could provide a precise figure of how many
hours he could walk per day. (ECF 44 at ¶ 21). Liu was unable to get this information from Dr.
Patel's office. *Id.* On April 8, 2019, Maria Flores, an employee of Sedgwick Claims Services,
Nielsen's worker's compensation administrator, informed Rosello via email that Dr. Patel would
limit Liu to walking four hours per day. (ECF 44 at ¶ 22). Driving would not be affected. *Id.*
Despite receiving this information from Flores, however, Rosello continued to ask Liu to find out
from Dr. Patel how many hours he was limited to working. *Id.*

Because he had not received a response from Dr. Patel, Liu attempted to see a different
doctor. He was told by Rosello that he would need to find an office that accepted Nevada's
workers compensation fee schedule because his work injury had been filed in Nevada.

(ECF 44 at ¶ 23).[4] After contacting a doctor's office, Liu learned that his worker's compensation claim had been denied because an obstacle had not led to Liu's ankle injury. (ECF 44 at ¶¶ 24-25).[5] For this reason, Liu was unable to see a doctor because he did not have personal health insurance to pay for the visit. (ECF 44 at ¶ 26).

On April 18, 2019, Chris Gordon, a Nielsen HR employee, told Liu that he would be placed on unpaid personal leave on April 22 if he could not get a doctor's note to clear him to return to work. (ECF 44 at ¶ 27). Dr. Patel's letter was deemed insufficient because of the "if possible" language regarding limiting walking. *Id.* Liu contacted Tracy Staines, Vice President of Human Resources, to ask about returning to work and again brought up that he intended to report discrimination and retaliation. (ECF 44 at ¶ 28). Staines told Liu that the return to work matter was separate from the discrimination complaint and would be handled separately. *Id.*

On April 20, 2019, Liu sent an email with the subject line "Formal Complaint Against Tanner Tate" citing racism, discrimination, retaliation, and harassment, to Buggy, Philips, and David Kenny, CEO of Nielsen. (ECF 44 at ¶ 31). In the email, Liu stated that he was considering filing an EEOC complaint if the situation was not remedied by Nielsen. *Id.* Liu did not receive confirmation that the email had been received by any of the recipients and asked Staines, via text message, if she could confirm receipt. (ECF 44 at ¶ 33).

After Liu contested his worker's compensation claim and had the claim transferred to New Jersey from Nevada, Liu visited an urgent care facility on April 23, 2019 and received a full

---

[4] Liu transferred from Las Vegas to New York in 2016. (ECF 44 at ¶ 23). It is unclear from the Amended Complaint why his work injury suffered in 2019 was filed in Nevada.
[5] Liu disputes this conclusion on the grounds that stairs are obstacles and he was injured on a staircase. (ECF 44 at ¶ 25).

return to work letter. (ECF 44 at ¶¶ 29, 32). Liu transmitted the letter via text message to Staines that same day at 2:58 p.m. (ECF 44 at ¶ 32).

### 6. Nielsen terminates Liu's employment

At 4:59 p.m. on April 23, 2019, approximately two hours after Liu transmitted his return to work letter to Staines, Staines contacted Liu to schedule a call at 5:30 p.m. (ECF 44 at ¶ 34).

At 5:30 p.m., Liu participated in a conference call with Buggy and Staines. (ECF 44 at ¶ 35). Buggy told Liu he was being terminated from his employment "because they lost faith in [his] ability to do his work." *Id.* On the call, Liu asked if the company had received his "Formal Complaint Against Tanner Tate" email sent on April 20. (ECF 44 at ¶ 40). Buggy acknowledged receipt and "stated they will look into it." *Id.* Liu was offered seven weeks of severance pay in exchange for signing a general release waiver of his right to sue Nielsen. (ECF 44 at ¶ 41). Liu refused. *Id.*

On the call, Liu also asked about the letter he had received on April 18 from Gordon that stated that Liu would be placed on personal leave and provided with a rental car for thirty days on April 22 if he did not provide a return to work letter by that date. (ECF 44 at ¶ 42). Buggy told Liu that, because he had been terminated, he would no longer have access to the rental car. *Id.* Buggy also told Liu that Liu's personal days, sick days, and holidays would be applied to cover the time he had missed from work due to his injury. (ECF 44 at ¶ 44).

### B. Procedural Background

On September 25, 2019, Liu filed a charge of discrimination with the EEOC, alleging that he had been discriminated against on the basis of race and disability, and retaliated against for complaining about race discrimination. (ECF 30-1). On June 25, 2021, the EEOC issued a

Dismissal and Notice of Rights, advising Liu that he had 90 days from receipt of the notice to file a Title VII claim in federal court. (ECF 44 at ¶ 68).

On September 20, 2021, Liu filed a *pro se* complaint against Nielsen in the United States District Court for the Northern District of California (the "California Action"). (ECF 44-1 at 44). On September 23, 2022, the district court dismissed Liu's complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), finding that the court did not have general or specific jurisdiction over Nielsen. *See* Northern District of California Opinion ("N.D. Ca. Opinion") (ECF 44-1 at 36-42). The court's dismissal was "without prejudice to Plaintiff filing suit in another venue," and the court "suggest[ed] that the Southern District of New York or the District of New Jersey may be the proper venue for Plaintiff's claims regarding his termination of employment." *Id.* at 6.

On October 22, 2022, Liu filed this action in the United States District Court for the Southern District of New York. (ECF 1). Nielsen moved to dismiss the complaint on May 23, 2023. (ECF Nos. 28-29). Liu filed an Amended Complaint on June 20, 2023, asserting additional claims under the NYSHRL. (ECF 44).

Nielsen moved to dismiss the Amended Complaint on January 26, 2024. (ECF Nos. 53 and 54). The motion was fully briefed as of May 24, 2024, when Liu filed his sur-reply with leave of the Court containing additional exhibits. (ECF 89).

III.    **ANALYSIS**

A.  **Standard of Review**

Under Fed. R. Civ. P. 12(b)(6), dismissal must be granted where the complaint fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). The Court is limited to the complaint's factual allegations, documents attached to the complaint, matters of judicial notice, and documents which the plaintiff relied on in filing the complaint. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

Where, as here, the plaintiff is proceeding *pro se*, the complaint is to be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This includes drawing all reasonable inferences in the plaintiff's favor and reading the allegations to "raise the strongest claims that the allegations suggest." *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 282 (S.D.N.Y. 2011). In the *pro se* context, the Court may also consider materials outside of the complaint, "in particular, materials that a *pro se* plaintiff attaches to his opposition papers." *Ceara v. Deacon*, 68 F. Supp. 3d 402, 410 (S.D.N.Y. 2014) (citations omitted). Although the Court accepts the plaintiff's factual allegations as true when deciding a motion to dismiss, the Court does not need to accept "labels and conclusions" or "assertion[s]' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court has reviewed Defendants' motion to dismiss (ECF Nos. 53 and 54), Plaintiff's response in opposition (ECF 75), Defendants' reply in support (ECF 77), and Plaintiff's sur-reply in opposition (ECF Nos. 89 and 96), as well as the attached exhibits.

### B.  Title VII Claims – Timeliness

An action brought under Title VII must be commenced within ninety days of the plaintiff's receipt of a right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(e); *Criales v. American Airlines, Inc.*, 105 F.3d 93, 95 (2d Cir. 1997).

The EEOC issued Plaintiff's right-to-sue letter on June 25, 2021. (ECF 44 at ¶ 68). Plaintiff filed this action on October 22, 2022, more than ninety days after the letter was issued and received electronically. (ECF 1). Plaintiff does not contend that this action was filed within ninety days of his receipt of a right-to-sue letter from the EEOC. Rather, Plaintiff argues that equitable tolling should apply and his suit be permitted to proceed.

Equitable tolling permits courts to accept late filings "where necessary to prevent unfairness to a plaintiff who is not at fault for [its] lateness in filing." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (quotation omitted). A litigant is entitled to equitable tolling "only if the litigant establishes two elements: '[1] that he has been pursuing his rights diligently, and [2] that some extraordinary circumstance stood in his way and prevented timely filing.'" *Menominee Indian Tribe v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). "The diligence element centers on matters within the litigant's control, while the extraordinary-circumstances element focuses on external factors." *Blue Angel Realty, Inc. v. United States*, 645 F. Supp. 3d 303, 307 (S.D.N.Y. 2022) (citing *Menominee Indian Tribe*, 577 U.S. at 257).

"[A] Title VII action pursuant to 42 U.S.C. § 2000e–5(f) must be brought within 90 days of receipt of an EEOC right-to-sue letter, and the timely filing of a complaint does not suspend the limitations period." *Copeland v. Rosen*, 25 F. App'x 17, 19 (2d Cir. 2001) (citing *Minnette v. Time Warner*, 997 F.2d 1023, 1026–27 (2d Cir. 1993). But although the timely filing of a complaint does not *suspend* the limitations period, courts retain discretion to grant equitable tolling of Title VII's ninety-day rule. *Elgendy v. City of New York*, No. 99-CV-5196 (JGK), 2000 WL 1119080, at *3 (S.D.N.Y. Aug. 7, 2000) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385,

398 (1982). "Equitable tolling may be permitted where a claimant has actively pursued judicial

remedies by filing a defective complaint within the statutory period" provided that the plaintiff

has acted "diligently." *Id.* at *3 (citing *Irwin*, 498 U.S. at 96; *Baldwin County Welcome Ctr. v.*

*Brown*, 466 U.S. 147, 151 (1984) (per curiam)).

Because I find that Plaintiff has acted diligently, and that extraordinary circumstances

prevented his timely filing, I recommend that equitable tolling be applied.

As to Plaintiff's diligence, *i.e.*, matters within his control, Plaintiff filed an action *pro se* in

the Northern District of California on September 20, 2021, 87 days from when the EEOC issued

its right-to-sue letter. (ECF 44-1 at 44). Plaintiff filed suit in California, believing it to be the

correct forum, alleging that "discriminatory practices [that] started in 2016 and may have

occurred while [Liu] was stationed in the Bay Area for a period of two weeks during that year,"

and that "the same discriminatory practices continued in 2017 when he traveled for work to

Los Angeles and again in 2018 when made another trip to San Diego." (N.D. Ca. Opinion at 6).

On September 23, 2022, the district court dismissed Plaintiff's suit for lack of personal

jurisdiction, finding that it could not exercise general jurisdiction or specific jurisdiction over

Nielsen.

Plaintiff then filed the instant action in New York, also *pro se*, on October 22, 2022, less

than thirty days from the dismissal of his California action. (ECF 1). During this interval, Plaintiff

was also engaging in settlement negotiations with Defendants and considering an appeal to the

Ninth Circuit, which he ultimately did not pursue. Contrary to Defendants' assertion that

"Plaintiff failed to act with reasonable diligence to timely file his suit in this Court," *see* ECF 77

at 6, the Court finds that a delay of less than thirty days in filing a lawsuit in a district court

across the continent is, for a *pro se* Plaintiff living out of his car, *see* ECF 75 at 7, reasonably diligent.

As to extraordinary circumstances, *i.e.*, matters not within his control, in addition to the fact that Plaintiff was "homeless living in his car" at the time, *see* ECF 75 at 7, Plaintiff also reasonably relied on the California district court order in choosing a course of action. The district court in California dismissed Plaintiff's action under the express assumption that Plaintiff could re-file his action and proceed in a different district. In the court's order dismissing Plaintiff's suit, Senior District Judge Jeffrey S. White wrote: "[T]he Court DISMISSES this action without prejudice to Plaintiff filing suit in another venue. The Court suggests that the Southern District of New York or the District of New Jersey may be the proper venue for Plaintiff's claims regarding his termination of employment." (N.D. Ca. Opinion at 6). [6]

The district court's opinion suggests that, rather than a strictly jurisdictional issue, any deficiency in Plaintiff's original suit is framed equally well as a *forum non conveniens* issue solvable by a transfer of venue. Plaintiff's pleading did allege instances of discrimination that took place in California, the forum state, even if the district court ultimately concluded that those instances were not sufficient to support an exercise of general or specific jurisdiction. Plaintiff's choice of forum was not unreasonable, particularly in light of the fact that he was

---

[6] Plaintiff's failure to pursue an appeal of the court's dismissal to the Ninth Circuit does not support a finding that he was not diligent. As already mentioned, Plaintiff was homeless and living out of his car at the time. The expense of filing an appeal, had Plaintiff not been granted IFP status, was not negligible. Moreover, although Defendants' conduct in carrying out settlement negotiations was not fraudulent or deceptive, their conduct had the effect of giving Plaintiff the reasonable impression that an appeal would not be necessary. This is especially true given the California district court's opinion that Plaintiff could re-file in a different forum if negotiations failed.

The Court also notes that Plaintiff refiled in the Southern District of New York within the time he had to appeal the N.D. Cal. Ruling, see Fed. R. App. P. 4, and during the time he was in settlement discussions with the Defendants. It would not be in the interests of justice or equity to impute "lack of diligence" in a *pro se* Plaintiff when an appeal to the Ninth Circuit seeking transfer of his case, on the date he *actually filed* in this Court, would have been found to be timely.

proceeding *pro se* and living in California at the time of filing. Had the court transferred the action to New York or New Jersey, rather than dismissing it without prejudice, Plaintiff's Amended Complaint would relate back to the earlier complaint that was timely-filed in California, and accordingly also be timely.[7]

In similar instances, the Second Circuit has recognized that dismissal of an action is a "harsh remedy" when the action would be time-barred if re-filed, and if the procedural defect leading to dismissal can be cured by a transfer of venue. Specifically, in *Minnette v. Time Warner*, the Second Circuit vacated the lower court's judgment of dismissal and transferred the underlying case to the Eastern District of Virginia, finding that such a transfer was "in the interest of justice." 997 F.2d 1023, 1027 (1993). In *Copeland v. Rosen*, the Second Circuit considered a Title VII action where "the dismissal without prejudice suggests that the district court may have believed that the sanction imposed was a limited one, simply forcing appellant to refile the action." 25 Fed. App'x 17, 19 (2001). The Second Circuit, "uncertain whether the district court intended to impose a sanction less drastic than one that is essentially a final dismissal," remanded the case with instructions to the district court "to address the appropriateness of dismissal where refiling is barred." *Id.* at 19-20.

Here, applying equitable tolling carries out the Second Circuit's preferred policy of imposing a more "limited sanction" of re-filing rather than outright dismissal on easily-cured procedural grounds. Nor is there any prejudice to Defendants in allowing Plaintiff's suit to

---

[7] The district court in California could have transferred the case even without finding that it could exercise personal jurisdiction over Nielsen. *See* 28 U.S.C. § 1406.

proceed given that, had the California district court transferred Plaintiff's action rather than dismissing it with prejudice, there is no question that the action would not be time-barred.

Accordingly, equitable tolling should be applied and Plaintiff's suit permitted to proceed, and the merits of the motion to dismiss to be considered, as if it had been timely filed.

### C. Title VII Claims – Merits

#### 1. Race Discrimination

Intentional discrimination claims brought under Title VII are subject to the *McDonnell-Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). To defeat a motion to dismiss in an employment discrimination suit brought under Title VII, a plaintiff "does not need substantial evidence of discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). To make out a *prima facie* case of employment discrimination, a plaintiff need only show: (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation. *Id.*; *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014). To survive a motion to dismiss, the facts "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give *plausible support* to a *minimal inference* of discriminatory motivation." *Id.* (emphasis added).

Plaintiff has alleged that he is a member of a protected class because he is of Chinese-American descent. Next, Plaintiff has alleged that he was qualified for the position he held as a membership representative, as he had received commendations for his performance. (ECF 44 at ¶ 56). Plaintiff has also alleged that he suffered an adverse employment action in the

form of assignment to "Asian" (but not Mandarin-speaking) homes that had already been visited unsuccessfully by a membership representative, lower bonuses, poor performance reviews, and termination.

Finally, Plaintiff has alleged facts sufficient to find that these actions occurred under circumstances giving rise to an inference of impermissible discriminatory motivation.

Plaintiff alleges that Defendants instituted a policy of sending him to recruit "Asian" homes because he was Chinese-American, identifying specific areas "Asian area[s]" based on census data. (ECF 44 at ¶ 52). Plaintiff alleges that, if another membership representative encountered an "Asian" household that did not speak English, the household would be re-assigned to Plaintiff. Plaintiff alleges that he was then penalized for failing to recruit an "Asian" household, even though Plaintiff only speaks English "fluently" and Mandarin "at a moderate level," and does not speak any other Asian language, such as Cantonese, Korean, Vietnamese, or Japanese. Plaintiff's failure to recruit households that did not speak English or Mandarin adversely affected both his recruitment metrics and his monthly bonuses, both by reducing the number of homes he could recruit because of a language barrier that he shared with the other, non-Chinese recruiters, and reducing the likelihood he could recruit these homes at all, since they had already refused a prior English-speaking recruiter.[8]

Plaintiff has also alleged that on February 20 his manager called him a "chink" after he complained about being told to stop talking on a team conference call. Plaintiff has alleged that, on March 4, shortly after his manager called him the racial slur, Nielsen employees made

---

[8] An additional concern underlies the implicit bias in the reassignment, i.e., that because Plaintiff presents as "Asian," that other Asian households might be more receptive to him based only on his appearance, regardless of other potential language, cultural, racial, ethnic or religious differences.

offensive statements about people of Asian descent in a company groupchat, and when

Plaintiff expressed that he found the statements offensive, was told by his manager that he

should "drop the subject." (ECF 96 at 9). On March 20, Plaintiff's manager criticized Plaintiff

during his annual summary for his non-participation in conference calls and graded Plaintiff an

"inconsistent contributor" even though, as Plaintiff alleges, Plaintiff had "the most sign ups on

his team and the 5th most signs [sic] nationwide for the evaluation period." (ECF 44 at ¶ 55).

Plaintiff alleges that other membership representatives on his team did not receive low

evaluations and that, less than a month prior to his manager calling him the racial slur, Plaintiff

was awarded a "Simply Excellent Award" by the same manager and was praised for

contribution to the team's social media efforts. (ECF 44 at ¶ 56). Plaintiff further alleges that his

previous manager (Tate's predecessor) graded Plaintiff "Highly Successful Contribution" in

2018. *Id.* Plaintiff was terminated on April 23, 2019.

These allegations satisfy Plaintiff's minimal burden at the pleading stage. *Littlejohn*, 795

F.3d at 308-309.

Defendants argue that Plaintiff's allegations amount to "one comment and stray texts in

a group chat," and that his poor performance evaluation was because he had stopped speaking

during conference calls. (ECF 54 at 17). Defendants also argue that Plaintiff's poor performance

evaluation was not an "adverse employment action" because it did not effect a material change

in his working conditions.

As already discussed, the phrase, "Don't be a chink" cannot be handwaved away as a

"comment." Rather, it is a hateful and destructive incident of verbal abuse by a supervisor to

his direct report. Nor, in this context, can the comments in the team groupchat be dismissed as

"stray texts," given that Plaintiff's supervisor had called him a racial slur less than a month prior, and told him to stop voicing his opinion that he found the groupchat remarks offensive. Plaintiff's offense at these remarks is also reasonable in light of his being assigned to "Asian" households that did not speak Mandarin, and objecting to those assignments. Finally, Defendants disregard completely the allegation that the reason Plaintiff stopped participating in conference calls was because he had been told to do so *by his direct supervisor* in front of his team members, and that that same supervisor called him a racial slur when Plaintiff told him how his conduct on the conference call had made him feel.

Next, while it is true that a poor performance review may not, on its own, constitute an adverse employment action for Title VII purposes, Plaintiff's complaint contains sufficient allegations that his material work conditions changed following this poor review. On March 18, before this review, Tate told Plaintiff that he could return to work with his injured ankle. Following the March 20 review, however, Plaintiff began to be told he needed a return-to-work letter, spawning the saga that eventually ended in his termination. Moreover, even if the performance review does not constitute an adverse employment action, a liberal and plausible reading of *pro se* Plaintiff's complaint is that his termination on April 23 was also an adverse employment action that could plausibly be motivated by discriminatory intent or, alternatively, pretext for his termination.

Additionally, Plaintiff has plausibly alleged that by assigning him to "Asian" households that had already been unsuccessfully contacted by a membership representative, Defendants put him in a position where he was less likely to succeed in hitting his sign-up targets.

Defendants' practice of assigning Plaintiff to "Asian" households may be, itself, an adverse employment action that could plausibly be motivated by discriminatory intent.[9]

Therefore, the Court finds Plaintiff has adequately stated a claim for race discrimination under Title VII. I recommend that Defendants' motion to dismiss be **denied** as to Counts 1 and 2 of Plaintiff's Amended Complaint.

2. *Retaliation*

In order for a Title VII retaliation claim to survive a motion to dismiss, a plaintiff must present evidence that shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). The allegations in the complaint need only give plausible support to the *prima facie* requirements of *McDonnell Douglas* in the initial phase of a Title VII litigation. *Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015).

 "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville &*

---

[9] Defendants argue that Plaintiff's inclusion in the Mandarin language pay incentive program "was inherently a benefit to him, not a detriment," irrespective of his allegations that his assignment to "Asian" households negatively impacted his performance metrics and monthly bonuses. At this stage of the litigation, that is far from clear. It is plausible that whatever benefits Plaintiff may have obtained from inclusion in the language pay incentive program were outweighed by the negative impacts of his assignment to households that did not speak English or Mandarin, and which had already refused recruitment by other (presumably White but certainly non-Chinese) recruiters. In addition, the fact that Plaintiff was assigned to households that spoke Asian languages other than Mandarin supports an inference that he was assigned to these households because of race and ethnicity, rather than his ability to speak Mandarin.

*Davidson Cnty., Tenn.*, 555 U.S. 271. 276 (2009) (internal quotation marks omitted). "*Crawford*

stated that any activity designed 'to resist or antagonize . . . ; to contend against; to confront;

resist; [or] withstand' discrimination prohibited by Title VII constitutes a protected oppositional

activity." *Littlejohn*, 795 F.3d at 317 (quoting *Crawford*, 555 U.S. at 276) (alterations in original).

Plaintiff alleges that he complained to management at some unspecified time that he

did not want to be targeted with Asian homes. When he did so, he was informed that "since Liu

was receiving a language pay incentive for speaking Mandarin, it was allowed." (ECF 44 at ¶ 53).

Plaintiff attempted to get his language incentive removed. It is unclear from the complaint

whether the incentive had been removed at the time of his termination.

Plaintiff has also alleged that he participated in a protected activity before his

termination both by sending an email to Philips on March 20, and by sending an email with the

subject line "Formal Complaint Against Tanner Tate" citing racism, discrimination, retaliation,

and harassment, to Buggy, Philips, and David Kenny, CEO of Nielsen on April 20. Plaintiff has

also alleged that Defendants knew of his protected activity as, on his termination call, Plaintiff

asked Buffy asked if the company had received his "Formal Complaint Against Tanner Tate"

email sent on April 20. (ECF 44 at ¶ 40). Buggy acknowledged receipt and "stated they will look

into it." *Id.* Plaintiff has also alleged an adverse employment action, the termination of his

employment.

Finally, Plaintiff has sufficiently alleged that there was a causal connection between his

engaging in protected activity and the adverse employment action. The timing of his

termination only three days after his sending an email formally complaining of discrimination

by his manager and expressing his intent to instigate an EEOC proceeding, in addition to the

increased difficulty he faced receiving clearance to return to work after sending the initial email

raising a complaint of discrimination on March 20, support a plausible inference that Plaintiff's

termination was retaliatory in nature. More specifically, it is plausible from the face of the

Complaint that Defendants rescinded approval for Liu to return to work after receiving Liu's

email complaining of discrimination, and began working to establish a paper trail to justify his

eventual termination.

The Court finds that Plaintiff has adequately stated a claim for relief for retaliation

under Title VII. Therefore, I recommend that Defendants' motion to dismiss Count 3 (styled

"Retaliation (Count 1)") of the Amended Complaint be **denied.**

### D. ADA Claims

Plaintiff brings disability and retaliation claims under the ADA.

A complaint asserting claims under the ADA must be filed within 90 days of the

claimant's receipt of a right-to-sue letter. 42 U.S.C. § 2000e-5(f)(1). For the same reasons set

forth in Section III.B, Plaintiff's disability discrimination claims should be equitably tolled and

allowed to proceed to be considered on the merits.

However, Plaintiff does not state a *prima facie* case of disability discrimination. To

establish disability discrimination under the ADA, a plaintiff must demonstrate: "(a) that his

employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or

perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential

functions of the job with or without reasonable accommodation; and (d) that he suffered an

adverse employment action because of his disability." *Rodriguez v. Verizon Telecom*, No. 13-cv-

6969 (PKC) (DCF), 2014 WL 6807834, at *3 (S.D.N.Y. Dec. 3, 2014) (quoting *Brady v. Wal–Mart*

*Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)). A qualifying disability under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

Because Plaintiff has failed to plead facts to satisfy the second prong, that he is disabled within the meaning of the ADA, his disability discrimination claims should be dismissed.

The Second Circuit has held that a disability discrimination claim under the ADA may not be dismissed solely on the ground that the impairment is temporary. *Hamilton v. Westchester Cty.*, 3 F.4th 86, 93-94 (2d Cir. 2021). However, in order for a temporary injury to qualify as a disability, it must still "substantially limit one or more major life activities." 42 U.S.C. § 12102(1). Plaintiff's ankle injury did not do this. As Plaintiff states in his Amended Complaint, he was able to walk for limited amounts of time per day as well as drive, and was accordingly able to perform his job with little to no need for any accommodations. This does not qualify as a disability within the meaning of the ADA.

Moreover, as to Plaintiff's retaliation claim, Plaintiff does not plead that he engaged in any protected activity relating to his ankle injury by complaining about disability discrimination prior to his termination. Plaintiff's March 20, 2019 email refers to "discrimination" and "racism" in his relationship with Tate, but makes no mention of any disability or disability discrimination by Nielsen.

Accordingly, Defendants' motion to dismiss Count 4 of Plaintiff's Amended Complaint (styled "Retaliation (Count 2) / Disability Discrimination") should be **granted**.

### E.  NYSHRL Claims

Plaintiff brings parallel claims under the NYSHRL for race discrimination and retaliation, and disability discrimination and retaliation. Defendants move to dismiss Plaintiff's NYSHRL claims on the grounds they are not timely and, even if they were timely, Plaintiff has failed to allege race discrimination, disability discrimination, or retaliation.

If a plaintiff adequately states a claim under Title VII, they necessarily state a claim under the NYSHRL. *Farah v. Emirates & Emirates Severance Plan*, No. 21-CV-05786-LTS, 2024 WL 1374762, at *5 (S.D.N.Y. Mar. 31, 2024). Thus, if Plaintiff's claims are both timely under the NYSHRL and properly plead under Title VII, they should proceed to discovery. As discussed above, Plaintiff's race discrimination and retaliation claims should survive dismissal under Title VII.

Federal Rule of Civil Procedure 15(c)(1)(B) provides that a claim asserted in an amended pleading "relates back to the original pleading" if it "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." A claim also relates back if "relation back is permitted by the law that provides the statute of limitations applicable to the action." Rule 15(c)(1)(A). Under New York law, which provides the applicable statute of limitations here, a claim relates back if the original pleading gave "notice of the transactions, occurrences, or series of transactions or occurrences" in the amended pleading. N.Y. C.P.L.R. § 203(f).

"Despite the slight variations in language, courts have construed Rule 15(c)(1)(B) and Section 203(f) similarly." *White v. Automatic Data Processing, Inc.*, No. 1:22-CV-04800 (JLR), 2023 WL 3222397, at *3 (S.D.N.Y. May 3, 2023). Here, Plaintiff's proposed NYSHRL race

discrimination and retaliation claims relate back because they arise from the same conduct, transactions, or occurrences as the discrimination claims alleged both in Plaintiff's EEOC complaint, his complaint filed in the Northern District of California, and his original Complaint filed in this action.

Accordingly, Defendants' motion to dismiss should be **denied** as to Plaintiff's NYSHRL race discrimination and retaliation claims in Counts 1-3 of the Amended Complaint, and those claims should proceed to be judged on the merits.[10]

### F.    FLSA Claims

Plaintiff brings claims under the FLSA. "Under the FLSA, the general statute of limitations for minimum wage and overtime claims is two years. However, if the employee proves that the employer's violation is willful, the limitations period is increased to three years." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 503 (S.D.N.Y. 2015). Here, even assuming that Plaintiff's FLSA claims were timely filed, they do not meet the specificity standard required under *Twombly* and *Iqbal*. Plaintiff's factual allegations are only that he was told to "roll back his timecard" by a Nielsen manager and general allegations about Nielsen's timekeeping practices.

Accordingly, Defendants' motion to dismiss Count 5 of Plaintiff's Amended Complaint (styled "Cause of action for Wage Issues in Violation of FSLA") should be **granted**.

---

[10] For the reasons set forth above in Section III.D, Plaintiff's disability discrimination and retaliation claims fail under the ADA, and accordingly also fail under the NYSHRL. *See, e.g., Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 72–73 (S.D.N.Y. 2016) ("Disability discrimination claims under [the ADA and NYSHRL are] analyzed using the burden-shifting scheme set forth in McDonnell Douglas.").

IV.     **CONCLUSION**

For the foregoing reasons, I respectfully recommend that Defendants' motion to dismiss

be **GRANTED IN PART and DENIED IN PART** as follows:

- Counts 4 and 5 should be **DISMISSED**.

- Counts 1-3 should proceed to discovery as to Plaintiff's race and national origin

    discrimination claims and retaliation claims.

In addition, I recommend *sua sponte* that *pro bono* counsel be appointed to assist

Plaintiff with discovery. The factors to be considered in appointing *pro bono* counsel include the

merits of the case, Plaintiff's efforts to obtain a lawyer, and Plaintiff's ability to gather the facts

and present the case if unassisted by counsel. *See Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172

(2d Cir. 1989); *Hodge v. Police Officers*, 802 F.2d 58, 60-62 (2d Cir. 1986). Of these, the merits

are "[t]he factor which command[s] the most attention." *Cooper*, 877 F.2d at 172. "[C]ourts

should not grant" applications for appointment of *pro bono* counsel "indiscriminately" because

"[v]olunteer lawyer time is a precious commodity." *Id.*

Here, although it is unclear to what extent Plaintiff has attempted to obtain legal

counsel, the first and third factors weigh in favor of appointment of *pro bono* counsel. Plaintiff

brings substantive allegations of discrimination and retaliation, in particular those pertaining to

Defendants' policy of assigning him all "Asian" homes regardless of whether they spoke

Mandarin. Discovery on this topic, particularly if Plaintiff continues to pursue a disparate impact

theory, is likely to be complex and will benefit from the assistance of counsel.

The Clerk of Court is respectfully requested to mail a copy of this Order to the *pro se*

Plaintiff at the address listed on the docket.

**V.    OBJECTIONS**

In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* FED. R. CIV. P. 6. A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Jennifer H. Rearden, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Rearden.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir. 1983).

Respectfully submitted,

_s/  Ona T. Wang_

Dated:  August 13, 2024                                      **Ona T. Wang**
         New York, New York                           United States Magistrate Judge